# HEALTH CARE AND RETIREMENT CORPORATION OF AMERICA, etc. v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

Case No. 85-3235

State of Florida, Division of Administrative Hearings

October 14, 1986

## APPEARANCES OF COUNSEL

**Alfred W. Clark, Laramore & Clark, P.A.s,** for petitioner.

**Richard Patterson** for respondent.

**Donna H. Stinson, Moyle, Flanigan, Katz, FitzGerald & Sheehan, P.A.,** for intervenor American Health Care Center.

## OPINION

MICHAEL M. PARRISH, Hearing Officer.

### *RECOMMENDED ORDER*

This is a certificate of need case in which the Petitioner is an applicant seeking to construct a new nursing home in Collier County, Florida. The Respondent proposed to deny the application. The Intervenor joins the Respondent in contending that the application should be denied.

Pursuant to notice, a formal hearing was conducted in this case before Michael M. Parrish, a duly designated Hearing Officer of the Division of Administrative Hearings, beginning on May 27, 1986, in Naples, Florida, and concluding on May 28, 1986, in Tallahassee, Florida. The Petitioner and Respondent were the only parties represented at the first day of the hearing. All three parties were represented at the second day of the hearing.

### *INTRODUCTION AND ISSUES*

In their Prehearing Stipulation the original parties described the background and general nature of the controversy as follows:

In January, 1985, HRC filed an application for certificate of need to develop a new 120- bed nursing home in Collier County, Florida. By notice dated June 28, 1985, HRS stated its intention to deny HRC's application. HRC timely filed a request for formal administrative proceeding, and the proceeding was forwarded to the Division of Administrative Hearings.

By application supplement dated May 15, 1986, HRC has reduced this application to a 90-bed new nursing home. The nursing home will provide skilled nursing care to Alzheimer's patients and to patients discharged from hospitals in need of additional intensive nursing care, in addition to the typical nursing home patient.

HRS has denied HRC's application because, pursuant to Rule 10-5.11(21), Florida Administrative Code, there is insufficient need for the additional nursing home beds proposed by HCR.

In the Prehearing Statement the Petitioner described its position as follows:

HCR contends that there is an identifiable need for a nursing home in Collier County, Florida, to serve the needs of patients who suffer from Alzheimer's disease and similar disorders and patients who are discharged from hospitals with a continuing need for a high level of intensive care, often provided through sophisticated technical or mechanical means. Existing nursing homes in Collier County do not offer adequate facilities for such patients and refuse admission to such patients. These patients have experienced an inability to obtain such care in Collier County. HCR's proposed nursing home will provide needed care which is otherwise unavailable and inaccessible in Collier County. The application meets all criteria relevant to approval of a certificate of need.

HCR further contends that the nursing home formula shows a need for additional nursing home beds in Collier County. Previously, in circumstances where a need for additional nursing home services has been identified, HRS has approved certificates of need even through the nursing home formula showed a need for zero additional beds or a small number of additional beds.

In the Prehearing Statement the Respondent described its position as follows:

HRS contends, pursuant to the formula contained in Rule 10-5.11(21), Florida Administrative Code, that there is insufficient need in the January, 1988 planning horizon demonstrated for additional nursing home beds in Collier County to warrant approval of a new nursing home. Therefore, HRS contends that the HCR application should be denied. Further, in its original application, HCR did not identify services proposed specially for Alzheimer's disease patients or "sub-acute" patients. HCR did not and has not complied with provisions of Chapter 10-5.11(21)(b)10, Florida Administrative Code, regarding mitigated circumstances.

The Respondent also identified the following as an issue of fact to be litigated. "HRS contends that it should be determined whether HCR's supplement dated May 15, 1986, is a significant change in scope for which the application was originally submitted."

Because of its late intervention into this case, the Intervenor's position is not described in the Prehearing Statement. In general, the Intervenor urges denial of the application on the same grounds as those advanced by the Respondent.

The Intervenor did not attempt to become a party to this case until

the morning of the second day of the formal hearing. Respondent had no objection to the Petition To Intervene. The original Petitioner objected on the grounds that the effort at intervention was untimely and that the Intervenor was without standing. The objection to intervention was overruled and the Intervenor was granted party status subject to taking the case as it found it.[1]

Accordingly, intervention having been granted at the conclusion of the evidentiary presentation of the other parties, the Intervenor was not permitted to call any witnesses or offer any exhibits. Intervenor's participation before the Division of Administrative Hearings was limited to an opportunity to file proposed findings of fact and conclusions of law.

Following the hearing a transcript of proceedings was filed on July 8, 1986. Thereafter, all parties filed Proposed Recommended Orders containing proposed findings of fact. Careful consideration has been given to all of the Proposed Recommended Orders in the formulation of this Recommended Order. A specific ruling on all proposed findings of fact proposed by all parties is contained in the Appendix which is attached to and incorporated into this Recommended Order.

The Petitioner also filed an unopposed post-hearing motion requesting that its name be corrected in the style of this case. The motion is granted.

## FINDINGS OF FACT

Based on the stipulation of the parties, on the exhibits received in evidence, and on the testimony of the witnesses at the hearing, I make the following findings of fact.

### Findings based on admitted facts[2]

1. The parties agree that HCR properly filed a letter of intent and application for certificate of need for a new nursing home to be located in Collier County. The application was reviewed by HRS in the ordinary course of its activities, and HRS initially denied the application. HRS continues to oppose issuance of a CON because (a) there is

---

[1] Allowing intervention after the hearing began is, of course, contrary to the provisions of Rule 11I-6.10, Florida Administrative Code. Nevertheless, in view of the Petitioner's eleventh hour change in the theory of its case, it was concluded by the Hearing Officer that it would be better to perhaps allow a third party too much due process, rather than not quite enough. This is particularly so where the intervenor is precluded from offering evidence, raising new issues, or delaying the proceedings.

[2] The first three paragraphs of these findings of fact are findings of fact based on the parties' statement of admitted facts at pages 4 and 5 of their Prehearing Stipulation.

an insufficient need, pursuant to Rule 10-5.11(21), Florida Administrative Code, for additional nursing home beds to warrant approval of a new nursing home [Section 381.494(6)(c)1., Florida Statutes]; (b) the long-term financial feasibility and economic impact of the proposal is questionable because of low occupancy being experienced by existing nursing homes [Section 381.494(6)(c)9., Florida Statutes]. HRS proposed no other basis for denial of the application.

2. The parties agree that HCR meets all criteria for a certificate of need, with the exception of those two criteria listed in the immediately foregoing paragraph relating to need and financial feasibility/economic impact (relevant to low occupancy), which HRS contends have not been met.

3. The parties agree that HCR would provide good quality care to patients, that the project would be financially feasible if the occupancy projects asserted by HCR were obtained, that the costs and methods of proposed construction are appropriate and reasonable, and that the proposed facility would be adequately available to underserved population groups.

## The rest of the findings

4. In January, 1985, HCR filed an application for a certificate of need to develop a new 120-bed nursing home facility in Collier County, Florida. The original application described a traditional approach to nursing home care. By notice dated June 28, 1985, HRS stated its intention to deny HCR's application. HCR timely filed a request for formal administrative proceedings and this proceeding ensued. By application supplement dated May 15, 1986, HCR made certain changes to its original application. These changes included reducing the size of the proposed nursing home from 120 to 90 beds and changing the concept of the nursing home from a traditional nursing home to one specifically designed to address the treatment of Alzheimer's disease patients and sub-acute care patients. The supplement specifically provided that 30 of the 90 proposed beds would be "set aside to offer a therapeutic environment for patients with Alzheimer's or similar disorders." The project description in the original application contained no such provision.

5. HCR's proposed facility would consist of 90 nursing home beds, 30 assisted living beds, and an adult day care facility located adjacent to the nursing home portion of the facility. Those portions of the facility relating to assisted living and adult day care do not require certificate of need review. The estimated cost of the portion of the project which requires certificate of need review is $3.5 million. HCR

226

estimates that approximately 33⅓ per cent of the patients in the facility will be Medicaid reimbursed. It is proposed that 30 of the 90 nursing home beds be designed and staffed specifically to provide care and treatment necessary to meet the special needs of certain patients who suffer from Alzheimer's disease and dementia and exhibit need for care different from that found in the typical nursing home. It is proposed that another 30-bed wing be staffed and equipped to provide sub-acute, high-tech services such as ventilator, I.V. therapy, pulmonary aids, tube feeding, hyperalimentation and other forms of care more intensive than those commonly found in a nursing home and necessary for the care of patients discharged from hospitals and patients in the last stages of Alzheimer's disease. The remaining 30-bed wing would be devoted to traditional nursing home care.

6. HRS has adopted a rule which establishes a methodology for estimating the numeric need for additional nursing home beds within the Department's districts or subdistricts. This methodology is set out in Rule 10-5.11(21), Florida Administrative Code. This rule determines historic bed rates and projects those bed rates to a three-year planning horizon. Allocation to a subdistrict such as Collier County is adjusted by exiting occupancy in the subdistrict and the subdistrict's percentage of beds in relationship to the total number of beds in the district. Additional beds normally are not authorized if there is no need for beds as calculated under the rule. HRS calculated need utilizing current population estimates for January 1986 and projected need for the population estimated for January 1988, arriving at a need of approximately 16 additional nursing home beds for the January 1988 planning horizon. HCR projected need t the January 1989 planning horizon and projected a numeric need of approximately 38 additional nursing home beds. There are no applicants for additional nursing home beds in the January 1989 planning horizon (batching cycle).[3]

7. Alzheimer's disease is a primary degenerative disease of the central nervous system which results in a breakdown of the nerve cells in the brain. The disease is progressive, in that it begins subtly, often with forgetfulness or simple personality changes, and ultimately results in death following a phase in which the patient is bedridden and totally dependent upon others for survival. The cause of the disease is not known. The disease is much more common in the older age groups and

[3] Although there is no evidence on the point and no formal stipulation, counsel for the parties nevertheless appear to be in agreement that there *are* pending nursing home applications for Collier County addressed to the July 1988 planning horizon. (See Transcript, p. 54).

is very common in the southwest Florida area. (However, nothing in the evidence in this case suggests that Alzheimer's disease is more common in southwest Florida than in other parts of the state.) There is no known cure for Alzheimer's disease.

8. Alzheimer's disease patients are characterized by such symptoms as memory loss, communication problems, difficulty understanding, confusion, disorientation, inability to recognize care givers, waking at night, wandering, inability to socialize appropriately, and incontinence. The progress of the disease can be divided into stages. During the initial stage, the patients will display forgetfulness and subtle personality changes. As the disease progresses, the patients encounter increasing difficulty performing more than simple tasks, tend to be more emotional, become more confused, encounter difficulty with concentration and retaining thoughts, and often display poor judgment and a denial of the significant of their actions. In the next stage, the patients begin to require assistance to survive. Forgetfulness and disorientation increase and wandering patients are often unable to find their way. The patients become incontinent, experience sleep disturbances, become restless at night, and wander during the day, leading to considerable family distraction and difficulties for the care givers. The patients encounter difficulty recognizing family members and often become paranoid and fearful of those family members within the house. Violence and aggressive outbursts may occur. Finally, the patients progress to a stage in which they are totally inattentive to their physical needs, requiring total care. These patients are totally incontinent, experience frequent falls, develop seizures, and eventually become bedridden, going into a fetal position and becoming totally unable to provide any care for themselves.

9. Traditionally, most nursing home offer no special programs for patients who suffer from Alzheimer's disease and mix these patients with other patients in the nursing home. There is no nursing home in Collier County which provides programs specifically designed for the treatment of Alzheimer's disease patients. The nearest nursing home where such care can be found is in Venice, some 92 miles from Naples.

10. The total facility proposed by HCR is designed to provide a continuum of care of Alzheimer's disease patients and their family care givers. The adult care portion of the facility would enable family members to place Alzheimer's disease patients in day care for a portion of the day in order for the family care givers to maintain employment, perform normal household chores, and find relief from the extremely demanding task of constantly supervising and caring for an Alzheimer's disease victim. The adult day care portion of the facility would be

228

designed and staffed to provide a therapeutic program for the Alzheimer's disease patient and the patient's family. The assisted living portion of the facility would allow an Alzheimer's disease patient in the early stages of the disease to live in an environment, with his or her spouse if desired, where immediate care and routine supervision at a level lower than that required by a nursing home patient would be provided. Thirty nursing home beds in the facility would be available to the typical nursing home patient and to Alzheimer's patients whose physical needs more nearly approximate those of the typical nursing home patient and who do not display those characteristics which are disruptive to non-Alzheimer's patients, such as wandering, combativeness, and incontinence. For those Alzheimer's patients who should not be mixed with other nursing home patients because of their disruptive routines and who require unique programs and facility design features to meet their specific needs, a 30-bed wing would be set aside. Finally, for Alzheimer's patients in the final stages of the disease who require total care and are bedridden, and for patients discharged from local hospitals who require high-tech services, a 30-bed wing designed, staffed and equipped to provide such services would be set aside. The facility would provide a high level of staffing to meet the demanding, personal care needs of Alzheimer's patients and would provide 24-hour nursing supervision in that portion of the facility dedicated to intensive services for the bedridden and high-tech patient.

11. The design and equipment of the proposed facility are particularly addressed to the needs of Alzheimer's disease patients. Physically, the facility would allow patients freedom of movement both inside the facility and in an outside courtyard with porches, but the facility would be sufficiently secure to prevent the patient from wandering away from the facility. There would be amenities such as therapeutic kitchens which would allow patients still able to cook to do so. Fixtures in the facility would be designed so that the Alzheimer's disease patients could easily identify the functions of fixtures such as wastebaskets, toilets, and sinks. Features such as low frequency sound systems, lever door knobs, square instead of round tables, barrier-free doorways, special floor coverings, appropriate labeling, automatic bathroom lighting, and provisions for seating small groups of patients together would all provide the special care required by the Alzheimer's patient.

12. The concept of a separate unit for Alzheimer's disease patients is a new one, growing out of increased medical awareness of the disease. The proposed unit would be a prototype for the Petitioner.

13. There are four nursing homes in Collier County and 413 licensed nursing home beds. There are no approved but unlicensed nursing

home beds in Collier County. At the time that HRS initially reviewed the HCR application, Collier County nursing homes were reporting an average occupancy of approximately 70 per cent. At the time of the hearing, average occupancy of existing nursing home beds in Collier County was 83.5 per cent.

14. Existing nursing home beds in Collier County are underutilized and there are a number of nursing home beds available to the public. Also, there are available alternatives to nursing homes in Collier County.

15. HCR has projected reaching 95 per cent occupancy within one year of opening. This projection seems overly optimistic and unwarranted by prior history, as only one existing facility has an occupancy rate that high. HCR's occupancy projections are based on assumptions that the future growth will be similar to that experienced between 7/1/85 and 12/1/85. But more recent data shows that growth has been decreasing and that there was no growth for the most recent period prior to the hearing. If projected occupancy is not met, projected revenues will not be realized, and projections of financial feasibility will not materialize.

16. The record in this case does not contain evidence of patients' need for nursing home care documented by the attending physicians' plans of care or orders, assessments performed by the staff of the Department of Health and Rehabilitative Services, or equivalent assessments performed by attending physicians indicating need for nursing home care.

17. The local health plan (Policy 1, priority 4) requires an occupancy level of at least 90 per cent before new nursing homes can be approved. The local health plan (Policy 1, priority 6) also provides, "No new community nursing home facility should be constructed having less than 60 beds. However, less than 60 beds may be approved as part of an established acute care hospital facility."

## CONCLUSIONS OF LAW

Based on the foregoing findings of fact and on the applicable legal principles, I make the following conclusions of law.

1. The Division of Administrative Hearings has jurisdiction over the subject matter of and the parties to this proceeding. Sec. 120.57, Fla. Stat.

2. The first point of disagreement between the parties concerns the issue of which year should be used as the three-year planning horizon. Rule 10-5.11(21)(b), Florida Administrative Code, provides, in perti-

230

nent part, that ". . . the Department will determine if there is a projected need for new or additional beds *three years into the future* according to the methodology specified under subparts 1 through 10." (emphasis added) The Department interprets the underscored portion of the rule as establishing a planning horizon three years from the date of the filing of the application. That appears to be the most clear and logical interpretation that can be given to the quoted language. Accordingly, the application having been filed in January of 1985, the applicable planning horizon is January of 1988.

3. HCR argues that a 1989 planning horizon should be used, asserting that because there are no applicants vying for a January 1989 "fixed pool" of beds, use of a January 1989 planning horizon would not create any problems associated with evaluating an application based upon a pool of beds fixed subsequent to the applicant's batching cycle.[4] HCR's argument in this regard ignores the message from *Gulf Court*,[5] which was reiterated in *NME Hospitals, Inc. v. Dept. of Health and Rehabilitative Services*, 490 So.2d 1300 (Fla. 1st DCA 1986) at 1303:

> Finally, *Gulf Court* points out the necessity for HRS's "strict adherence to . . . [its] procedural rules governing the supplementation or amendment of completed applications before review and after denial . . . [in order that] all applicants desiring to compete for the same fixed pool of beds, [may be afforded] a *clear point of entry into the system*, without giving any applicant an undue advantage over a competing application.

As noted in another recent Recommended Order:

> Nothing in HRS' procedural rules purports to allow an applicant for certificate of need to make a unilateral election on the day of final hearing to have a pending application considered in a batch other than that in which it was filed. Such a procedure would neither "afford all applicants . . . a clear point of entry," 483 So.2d at 708, nor prevent "undue advantage over a competing application."

*Health Care and Retirement Corporation of America d/b/a Heartland of Dade v. Department of Health and Rehabilitative Services*, DOAH Case No. 84-3334 (Recommended Order issued August 1, 1986.) Therefore, there is no basis upon which to deviate from the appropriate planning horizon, which in this case is January 1988.

---

[4] However, there may be other applicants vying for a "fixed pool" of beds based on a planning horizon that falls between January 1988 and January 1989. (See footnote 3.)

[5] *Gulf Court Nursing Center v. Department of Health and Rehabilitative Services*, 483 So.2d 700 (Fla. 1st DCA 1985).

231

4. Applying the proper planning horizon, there is a need for only 16 additional nursing home beds in Collier County using the method for projecting such need contained in Rule 10-5.11(21), Florida Administrative Code. And in view of the local health plan provision that no new nursing home facility should be constructed having less than 60 beds, a projected need of 16 beds is the functional equivalent of no need at all. Subparagraph (b)10 of Rule 10-5.11(21), Florida Administrative Code, does, however, contain the following exception:

10. In the event that the net bed allocation is zero, the applicant may demonstrate that circumstances exist to justify the approval of additional beds under the other relevant criteria specifically contained in the Department's Rule 10-5.11. Specifically, the applicant may show that persons using existing and like services are in need of nursing home care but will be unable to access nursing home services currently licensed or approved within the subdistrict. Under this provision, the applicant must demonstrate that those persons with a documented need for nursing home services have been denied access to currently licensed but unoccupied beds or that the number of persons with a documented need exceeds the number of licensee unoccupied and currently approved nursing home beds. Existing and like services shall include the following as defined in statute or rule, adult congregate living facilities, adult foster homes, homes for special services, home health services, adult day health care, adult day care, community care for the elderly, and home care for the elderly. Patients' needs for nursing home care must be documented by the attending physicians' plans of care or orders, assessments performed by staff of the Department of Health and Rehabilitative Services or equivalent assessments performed by attending physicians indicating need for nursing home care.

The Petitioner seeks to prove entitlement to a certificate of need under this subparagraph, and in so doing, has presented evidence as to need for services for Alzheimer's and sub-acute care patients.

5. Here, as in the case of *Health Care and Retirement Corporation of America, d/b/a Heartland of Palm Beach v. Department of Health and Rehabilitative Services*, DOAH Case No. 84-3337 (Recommended Order issued July 8, 1986), the Petitioner's efforts to show a need for services for Alzheimer's and sub-acute care patients, and to thereby demonstrate entitlement under the above-quoted exception, were not raised by anything in Petitioner's original application. In Case No. 84-3337, the Petitioner sought to prove its revised theory of entitlement without formal amendment or modification of its application. In this case the Petitioner did purport to supplement its application, but it did

232

so only a few days before the formal hearing. In Case No. 84-3337, counsel for the Department raised numerous objections, both at hearing and in the Department's proposed recommended order, to allowing the Petitioner to attempt to prove entitlement to a certificate of need on a basis not raised in the original application. Those same objections have been made here. For well articulated reasons, the Hearing Officer in Case No. 84-3337 overruled the Department's objections and recommended that the Petitioner be awarded a certificate of need on the basis of its amended method of demonstrating need. Because of certain procedural differences between this case and Case No. 84-3337 and because of certain differences between the type of proof offered in Case No. 84-3337 and the type of proof offered in this case, it will be recommended that the application in this case be denied.

6. The most significant procedural difference between this case and Case No. 84-3337 is that in Case No. 84-3337 the only two parties entered into a stipulation which was described in the Recommended Order as one in which ". . . it appears that the Respondent waived any procedural irregularity and affirmatively chose to consider the amended proposal through evidence presented at the formal hearing." There has been no such stipulation here.

7. As noted in the Recommended Order in Case No. 84-3337, Rule 10-5.11(21), Florida Administrative Code, is somewhat different from other rules in that it contains more explicit guidelines for determining exceptional circumstances (or "not normal" circumstances), which guidelines appear in subpart (b)10 of the rule. The last sentence of that subpart reads as follows:

> Patients' need for nursing home care must be documented by the attending physicians' plans of care or orders, assessments performed by staff of the Department of Health and Rehabilitative Services, or equivalent assessments performed by attending physicians indicating need for nursing home care.

Unlike the evidence in Case No. 84-3337, the evidence in this case fails to meet the quality of proof required by the above-quoted rule provision. There is no evidence of any need documented by attending physicians' plans of care or orders. There is no evidence of any assessments performed by staff of the Department. And, finally, there is no evidence of equivalent assessments performed by any attending physicians. In a nutshell: The proof offered in this case is insufficient to meet the requirements of the last sentence of subpart (b)10 of Rule 10-5.11(21), Florida Administrative Code.

8. The Department has advanced numerous objections, primarily

objections founded on contentions that HRC's eleventh hour "supplement" to its application runs afoul of numerous statutory and rule provisions governing the proper processing of applications for certificates of need. On the evidence submitted in this case, it is clear that neither the original application nor the supplemented application is entitled to an award of a certificate of need under the numerical methodology established by Rule 10-5.11(21)(b)1-9, Florida Administrative Code. And it is equally clear that neither the original application nor the supplemented application is entitled to an award of a certificate of need under the exceptional circumstances provisions contained in Rule 10-5.11(21)(b)10, Florida Administrative Code. The case being one which should be denied on the merits, no useful purpose would be served by dealing at length with the procedural issues raised by the Department. Suffice it to say that in another case those procedural arguments may well compel the denial or remand of a supplemented or amended application.

## RECOMMENDATION

For all of the foregoing reasons, it is recommended that the Department of Health and Rehabilitative Services issue a Final Order in this case denying the Petitioner's application for a certificate of need to construct either its original proposal or its supplemented proposal.

DONE AND ENTERED this 14th day of October, 1986, at Tallahassee, Florida.